(No. 22941—

JOHN REGAN, Plaintiff in Error, v. THOMAS J. GRADY, Defendant in Error.

*Opinion filed December 10, 1936—Rehearing denied Feb. 3, 1937.*

LAURENCE M. FINE, (ROBERT D. MELICK, of counsel,) for plaintiff in error.

MAX MURDOCK, and ROBERT MCCORMICK ADAMS, for defendant in error.

Mr. JUSTICE JONES delivered the opinion of the court:

Complainant, John Regan, filed a bill in chancery against Thomas J. Grady and others, alleging the existence of a partnership between him and Grady. The prayer of the

bill asked for a dissolution of such partnership, an accounting, the appointment of a receiver, a sale of the assets of the partnership, a distribution of the proceeds and a cancellation of certain deeds. Issue was joined and the cause was referred to the master, who reported the testimony with his conclusions of fact and law. His report was approved and the bill was dismissed for the want of equity. The proceedings were instituted and a final decree was entered prior to the effective date of the Civil Practice act. The cause is in this court by writ of error.

The bill of complaint alleged that the partnership was entered into by an oral agreement in 1918 for the conduct of a real estate business; that at the time the agreement was made Grady was living on and operating a farm in Iowa; that he was in impecunious circumstances and greatly in need of money; that he desired to return to Chicago and re-open his real estate and subdivision business but had no means with which to do it; that Regan and his wife were then the owners of a certain parcel of real estate in Chicago; that Grady proposed they convey said property to him in order that he might obtain sufficient money and credit to start the business; that the proposition was agreed to and the conveyance made; that the consideration of the conveyance was the formation of the partnership, in which the partners were to share equally; that the partnership should extend for a period of five years, during which time the partners should have the benefit of a drawing account for family expenses; that the profits should remain intact until a final accounting; that at the expiration of said five years the accounting was mutually deferred for another five years, at the end of which the acquisition of real estate of the firm was in excess of a million dollars; that title to the various properties was taken in the name of Grady as trustee; that Grady, contriving to cheat and defraud Regan, has refused to make any accounting and by fraudulent means has obtained a deed to certain real estate known as

the "bungalow property," at 6558 North Richmond street, to which Regan claims title, including a homestead estate.

The evidence is extremely conflicting. The principal parties are brothers-in-law, Regan's wife being a sister of Grady. Prior to the date of the alleged partnership agreement Regan had been a locomotive fireman, an employee of the Surface Lines in Chicago and a common laborer. The record does not show he had accumulated any money or other property. Grady had been in the real estate and subdivision business since 1914 with a considerable degree of success. He was unmarried, and his health becoming impaired he purchased a farm in Iowa, where he resided a few years. The farm was quite valuable and Grady improved and stocked it at much expense. His real estate holdings in Chicago subdivisions were large. The World War came on. Grady being within the age limit for service expected to be called to arms. Anticipating that he might not survive the war, according to his testimony he made conveyances of real estate to members of his family, with the understanding and agreement among them that in the event he was alive when his service was over they would re-convey the properties to him. One of the deeds made in pursuance of his purpose was to John Regan and Beatrice Regan as tenants in common, conveying certain property in Rogers Park. This is the tract which Regan said he afterwards conveyed back to Grady in order to finance the partnership. Grady denies the formation of the partnership and claims that the re-conveyance to him was according to the agreement to return the tract if he survived the war. The proof shows that other tracts of land which he conveyed were re-conveyed to him in pursuance of the original understanding. Grady did not go to war because he was rejected for physical disability. The re-conveyances were made to him subsequent to that event.

The record in this case contains more than 1700 pages. The way in which it has been abstracted has made our work

very arduous. Nevertheless, after much study of the testimony we have concluded that the chancellor was correct in his finding that the re-conveyance was not a consideration for the formation of any partnership but was in compliance with the agreement to re-convey to Grady.

When Grady had decided to return from Iowa to Chicago he advertised a public sale of his personal property on the farm. He sent a letter to Regan requesting him to assist. Regan went to Iowa and helped arrange the property for sale and otherwise assisted Grady in preparing for his return to Chicago. Grady testified that he paid Regan $200 for his services of seven weeks. There is no doubt that Grady and Regan talked about the renewal of real estate operations in Chicago and that Regan was to assist in them. Regan claims that his activities were to be carried on as a partner, and Grady claims that Regan was to be an employee to look after properties, cut weeds and perform other manual labor. The parties returned to Chicago and subdivision operations were renewed. Real estate licenses were issued thereafter either to "T. J. Grady doing business as T. J. Grady & Company," or to "T. J. Grady of T. J. Grady & Company." Grady lived on the far North Side and Regan on the far South Side. The latter claims he obtained work and made certain contributions of money to the enterprise. This is denied by Grady. On Sundays, holidays and other occasions he bestowed his services to the real estate business. Finally he quit his usual employment and gave full time to the real estate business. In the meantime Grady married. Upon one of his properties he built a bungalow for his own use. There were no near dwellings and Mrs. Grady refused to live there. Regan and his family moved into it. Regan testified that one day Grady laid a deed to the property on his desk and told him that it was a conveyance of the bungalow property, but before leaving he claimed Grady picked up the deed and said that inasmuch as Regan had no safe he (Grady) would

take care of it. The deed was never recorded and there is little corroboration of Regan's story. This is the property to which Regan claims title and as to which he desires a cancellation of deeds made by Grady and others. Grady's version of the transaction is, that his sister, Mrs. Regan, told him that her husband was associating with gangsters on the South Side; that he was drinking a great deal, and she would like to get him out of the neighborhood; that in view of the long distance Regan had to travel and from a desire to help Regan and his family, Grady told Regan to occupy the bungalow. Grady paid the taxes and assessments and made all the repairs. In obtaining money for the erection of the building he borrowed something like $5000. Later he re-financed it. When the depression came on a foreclosure was instituted against him. Regan was made a party and testified on the hearing that he was an employee of Grady. No claim of partnership was made. Regan drew $40 a week for his services. It is not disclosed that he was very instrumental in making any sales of property. His services were more as a "look-out" man and as a laborer. It is significant that if, as he alleges, by 1929 the accumulations of real property amounted to more than a million dollars he would be satisfied with such meagre withdrawals as $40 a week over a period of ten years. No property stood in his name. No request or demand for profits which would make him affluent was made. He continued to cut weeds and show property to those who desired to rent. These facts are highly inconsistent with his claim.

As we have said, the record is voluminous, yet it would be without substantial value to either party to further discuss the facts in this case. We are convinced the finding of the master and the decree of the chancellor holding that no partnership existed are compatible with the testimony. The decree is therefore affirmed.     *Decree affirmed.*